Good morning, may it please the Court. My name is Doug Willans. I represent the lead plaintiffs, two institutional investors who represent a class of investors of Chipotle Mexican Grill, a restaurant chain that focuses on providing Mexican food-style offerings. Do you agree you have to vacate the judgment before you file your amendment, before we turn to the question of the amended commandment? Yes, I agree, but I think what we allege here and what the Second Circuit Authority state is, you can look to the nature of the amendment as a way to get there, to vacate the judgment. That's what happened in the Williams case. That's what happened in the SAIC case, where — and the SAIC case is almost identical here in that, in that case, the judge had said, well, there was — at the time, there was a contemporaneous trial. We moved — I was actually counsel in that case. We moved with an amended complaint that included information from the trial transcripts. So you do both at once. If the complaint merits our consideration, we would automatically then vacate the underlying judgment? Oh, yeah. I think if you look at the nature of amendment and, given this Court's strong preference for resolving disputes on the merits, that you could — Are you saying that the standard here is a Rule 15 standard that we're using? Well, it's — I guess if you want to look at it strictly from the terms of 59E, we would say it constitutes manifesting — That's what I'm supposed to be doing. Well, I'm saying the 59E standards include to correct a clear error of law, manifest judgment, and newly discovered evidence. We're saying, though, in the context of when there's a postmotion judgment that — where there's an amended complaint provided, you could — yes, you look at the Rule 15 standards in connection with the 59E standards. If you meet Rule 15, do you win? If you're — Yes. So you can go on. I mean, when — I mean, that's exactly what the U.S. Supreme Court said in the Foman v. Davis decision. That was a case that involved a post-judgment motion to amend the complaint. And the Court looked at the complaint, and it added a new claim there and said, as long as you meet Rule 15 and you look at the nature of amendment, can the amendment survive a futility analysis or any other types of — here we have a futility argument that the judge ruled upon, but, yes, you could look at the nature of the amendment under Rule 15 and determine that it was a clear error of law. Are you saying that if the judge — the district judge was wrong as to futility — let's just focus on that. Yes. You win? Yes. Any one of the — any one of the Foman factors? That's what Foman itself says, and that's what SAIC says, that you look at the nature of amendment. If we can show that the judge was wrong in finding that our claims were futile under SAIC, under Williams, and under a bunch of the other — Brutolo, the cases — and, again, we're at the pleading stage. We're not in a situation where we're after trial. You're not at the pleading stage, but you're at the pleading stage for the third time. Yes. This was a First Amendment complaint. Our concerns would be different. Well, I think — but I think if you look at what happened here, you know, a lot of — unlike a lot of securities cases where we're relying on confidential witnesses and situations like that, here we are relying on — large part on FOIA requests that went to the CDC. The district court said that that was not newly discovered, by and large. We never argued that that was newly discovered evidence. We just say that's information that we obtained through our factual investigation. It's not information that you obtained after the Second Amendment complaint. It was — what I'm saying is these were FOIA requests. We were — we were getting them from governmental agencies. We received information in drips and drabs, and we — My only question is, are you saying that the information that you're talking about that's new, and that's important for our consideration, was not available until after the Second Amendment complaint was dismissed? What I'm saying is we got information both at that time and additional information after that allowed us to piece the puzzle together. Okay. All right. I just want to make sure that I understand that it matters to me, I think. It's supposed to matter to me, I think, whether that additional information is additional information, assuming your motions were timely and all, whether it was additional information that was not available to you at the time you made your Second Amendment complaint and at the time it was ruled on. I would say we were able to put — have sufficient information to put together the proposed Third Amendment complaint after the judgment. We had to piece a lot of information. We received e-mails that, you know, were, you know, from different points in time. We got it all together. And the point is, we let the Court know that this was going on. The Court admonished us for having strategic reticence. I really don't mean to be overly picky. I just want to make sure I understand. You're saying that what you found out allowed you to put the pieces together, whereas you couldn't put the pieces together before? I want to say we firmly believe that we were correct in alleging our claims in the Second Amendment complaint. The judge disagreed, but we informed her all along, we are getting this information piecemeal, and we want to present a Third Amendment complaint. At the time of the Second Amendment complaint ruling, she said, I'm sorry, that's all futile. We got additional information that we told her we were going to get. We put that in the Third Amendment complaint, and we say, okay, well, we've now cured all the identified deficiencies that you have. We have now stated a claim under 12b-6 and under Williams and SAC. You can allow us to file a Third Amendment complaint, and she said no. Sotomayor, let's turn to the merits. I have to give you a minute. I don't have much time left for that, but I'll give you each five minutes more. I appreciate that, Your Honor. As you can see from our briefing, we have actually scaled back significantly from the other, what we've alleged in the Third Amendment complaint to focus on two major, two main claims. One are the SEC disclosure claims based on violations of items 303 and 503 in the October 2015 10-K. We then have a misrepresentation claim in the subsequent press release from November 10th of 2015. So there are two separate claims. We allege that they violated items 303 and 503, and at a minimum, I'll try to be brief, that they had 10 outbreaks in the course of a year, none of which was disclosed at the time of the third quarter of 2015 10-K, 10-Q. We allege they had a duty to disclose it under both. Were these outbreaks all related to one of their restaurants? Yes. Not just general food-borne illness. The CDC determined that for each of these 10 outbreaks, there was a linkage to Chipotle here. Now, in some instances, Chipotle was the only restaurant involved. In some situations, there were a more broader outbreak. But each one of these was related to Chipotle. The CDC or the local health officials contacted Chipotle directly and said, hey, we're trying to figure out what happened here, but that our claims are not about a broader outbreak in terms of trying to solve what happened here. What we're saying is Chipotle had a duty to disclose that Chipotle had an outbreak where Chipotle customers ate food, were sickened in Chipotle restaurants, and they had a duty to disclose it. What did the 10-Quarter 10-Q say about food-borne illness outbreaks? They said nothing specific. What the court did here was refer back to the risk disclosures that were in the 10-K at the time, which was filed in February of 2015, and said, well, we're going to incorporate those by reference. Our argument is that by October of 2015, that risk disclosure was stale. It was the same risk disclosure that they issued in 2014, 2013, and at least 2012. When did these 10 outbreaks occur in relation to the filing of their forms? There was one or two that were filed that occurred by the four, two or three, perhaps, that were filed that occurred by the time of the February 2014, but the bulk of them, and that's why we scaled it back, because you can say, okay, well, one or two may be a small number, as they say in their risk disclosure, but when you get to October of 2015, they've had 10. That's not a small number anymore in the course of a year. So they made no disclosure about any of those risks. But weren't these publicly known in any event? No. For the most part, they weren't known, or at least they were known only in a localized situation. That's our point. They were concealed. A lot of these didn't even become public until we filed them in our complaint. So, and what we've seen here is once they did, I mean, what essentially proves our point, or from which we draw inferences, is the fact that when they were publicly resulted, Chipotle suffered financial adverse consequences as a result. And if you look, I'll direct the court to 2000, I'm sorry, paragraph 263 in our proposed amended complaint, where, and that ties into the misrepresentation claim, because it's actually talking about what happened financially with respect to that outbreak, which is that when the outbreak was announced publicly, they suffered a 20% drop in sales. When they issued their false press release on November 10th, sales rebounded. And then 10 days later, when the CDC said, wait a second, there's more happening here than we believe, sales dropped again. So there's a direct financial consequence of the disclosure of these outbreaks. And if I could just have one more minute to talk about the misrepresentation claim. That, in the November 10th press release, we allege that the defendants made a false statement that health officials had concluded there was no ongoing risk from this incident. And that's just flat wrong? That is just flat wrong. They had no reasonable basis to make any statement about what health officials had concluded. If they had said, Chipotle believes there's no ongoing risk, we have a much different case. But they said health officials concluded that there's no ongoing risk. So we have, and we bolster that where we have email and telephone communications alleging the complaint, where health officials said, listen, guys, you have this E. coli outbreak here. I know it's now impacting your stores in Washington, Oregon. We think this is a much bigger situation here. I hate to go back to a procedural question, but what you just said, was that contained in your, those allegations in your second amended complaint? Yes. Is that second amended complaint on appeal to us now? No. We are alleging the third amended complaint. I think you can go back to substance. I mean, I mean, there may be, the general allegations are the same. We, I think we added some. No, I just want to understand what's before us. Yes. I mean, our point is the entirety of, we added new allegations on a lot of factors. So we're presenting the court with what we believe is our last and best complaint. And my question is, okay, all right. And I mean, we did not directly appeal that. So we're saying that statement is flat out wrong because they were told before and then they were confirmed after in the April, there was an April 2016th letter where, you know, and there was a whole back and forth that we alleged in our complaint between Chipotle and the CDC where they're arguing about, should you keep issuing these, you know, these updates and they're not useful. This, on April 16th, the CDC responded in a confirmatory letter, not fraud by hindsight. They're confirming the situation that was existing at the November 10th timeframe. And they said, we disagree with your position that there was no ongoing risk at the time of the press release and said no health official would have said there's no ongoing risk. So what the court did here, they took at the falsity stage to what I would say plausible readings of the press release and ruled that theirs was more plausible and that on a 12B6 motion that's just not the way to do it. We also alleged that those, just to make a final point, we alleged that those, you know, there was scienter for that statement because they had no basis and they knew they had no basis based on their communications with the CDC and health officials prior to the November 10th press release. I don't know if there's any questions. I'll, thank you very much for the time. Good morning. Good morning, Your Honor. May it please the court. Andrew Klubach of Latham and Watkins on behalf of appellees. Your Honor, began with a simple question. Does this court have to vacate the judgment first? The answer is simple. Yes. There are four cases, three of which were mentioned by appellant. One of which is the one that I'm going to talk about today. Two of which ignored by appellant that basically explain how this works. And Judge Hall was on one of these decisions, so I know Williams is well known. Your Honor, it starts with Supreme Court and Fomen. And Fomen, in that case, the plaintiff had been given not a, no chance to amend other than, you know, the initial perfunctory consolidation and amendment.  And in Fomen, the court applied, the Supreme Court applied an abuse of discretion standard to say it abused discretion to not give the plaintiff a second bite at the apple. Same in Williams. One chance, abuse of discretion under 59E for not giving them a second bite at the apple. Then we come to SAIC, highly unusual circumstance, where the court had at first partially denied, partially granted a motion to dismiss, but partially denied. As a result, the plaintiff below said, well, I'm not going to amend, I've got at least part of my case. Then the court, on reconsideration, suddenly reverse course, dismisses the whole case, pulls the rug out from under the plaintiff. And all of a sudden, the plaintiff's up on appeal saying, what the heck happened? And filed a Rule 60B6 motion, which is assessed under a different standard, to have that judgment overturned. Those three cases are mentioned. You can see the difference between all three of those cases. In this case, where the court gave plaintiffs two bites at the apple, and by the way, strongly hinted if they want a third bite at the apple, they better do it by amending before she issued her judgment in response to letters. So she gave them one extra bite in the apple than those other three cases, and strongly suggested they take advantage of the third. They disavowed it in response to the letters, the writing campaign, the appellants below said, we're not going to seek to amend. We're going to hold tight, and we're going to wait and see how this plays out, and she faulted them for that. But then we get to the fourth case. Now, admittedly, it's unpublished, but it's the Second Circuit of just last year, and it's the Fogel case. And in Fogel, exactly what happened in our case happened. The court below had given the second bite at the apple. The case then comes up under basically the exact same posture, where except, actually in that case, the appellants to Your Honor's question appealed both the denial of the Second Amendment complaint and appealed the refusal to exercise 50-90 abuse discretion. And in that case, the Second Circuit said, this court said, it's too late, that's enough, it's too much. They've already had their two chances. There has to be some balance. Rule 15 has to mean something. There has to be some finality. So here, this case is even – they're in even a worse posture than Fogel, where this Court just last year said, you don't automatically have this right to a third bite at the apple. And by hearing the argument, that's – it's clear that's what appellants think. Sotomayor, they argue that there's new information that they could not present to the Court by the times of the Second Amendment complaint. I would sure like to inquire, if I could, directly, but out through this Court, what is that new information? What you heard was the same thing, apparently, that Judge Failure heard. There's something new that we got. There's some piece of the puzzle that we needed some extra time to add to the PTAC. What is it? There's – what was the date of the received new information? And what's that key piece of the puzzle? And I say this because I hope they will answer in rebuttal if I'm wrong, that what it was was it gave them an ability to put all – it wasn't new information as such. Whatever it was gave them the ability to put all the information together in a way that would have passed this. That's an accurate summary of a pretty vague statement, because what we do know is all the specific information they had. There's two sources. No new pieces of information. There's no new piece of information. And there's two sources of the allegedly new pieces of information. One source is the derivative lawsuits that were pending in Colorado, where Judge Failure correctly found – and I represented the company and the defense there, so I know – that the Court acknowledged that that information had been made public like a year before the time of the Second Amendment complaint. And because it had been public a year before, when the Court issued the final motion to dismiss, which was before the opposition brief was due to the Second Amendment complaint, the Court said, well, we might as well unseal, because we've already made this public anyway. There's nothing left, really, that's necessary to keep under seal. So the Court – Judge Failure looked at this and said there is no new information from that derivative lawsuit. That was – I thought they got new information from the CDC. Am I wrong about that? Well, so then they jumped to that and they claimed that, well, no, no, it's the CDC. Turns out that what they ultimately said – and Judge Failure carefully noted this – that it was very vague in response to – in the briefing as to what they got and when they got it. They ultimately said that they got some information within two weeks of the final decision. That could mean they got it two weeks before the final decision, it could mean a day after. We don't know. But what we do know is that they sent letters to the Court before the judgment was entered. And those letters laid out every piece of information that we can see that could possibly have been relevant that was included in the PTAC. We've been unable to find that key, that final piece of the puzzle that somehow allowed them to tell a story when they were telling a pretty good story before with the Second Amendment complaint and in the letter-writing campaign that they did, which demonstrated they had the information at least weeks before. And this, too, is what happened in Fogel, because one of the bases for concluding the Court had not abused the discretion in Fogel was that the plaintiffs there had information three weeks before the final judgment. And here, it's clear that the plaintiffs had it much longer than that before, and to the extent there was some magic, secret, puzzle-unlocking key piece, they certainly didn't make a record of that. Maybe they'll come up, and I won't have a chance to respond or point out why. I'm sure that has – it's – you know, I have no doubt in the faith that they'll be able to find some paragraph change or one piece of information. But we've never seen it. We don't know what it is. And certainly, the Court below did not see it. Not enough to say that the Court abused its discretion in rejecting that and deciding that enough was enough, that you can't just take a leave to amend, sit on all this information, get – and by the way, in response to the letter-writing campaign, what they said was we are not going to move to amend now, even though the Court had strongly hinted that that's what they should do. And given all that, the Court properly entered judgment, and the only appeal that's before this Court is whether that was an abuse of discretion, and therefore, it should be vacated, and then we would get to the merits. Now, I started with the procedure because that's where this Court started. I don't know if I should say this or not. The article tells us that the merits are intertwined inextricably with the procedural posture as well. I think that's what he said. I think so. I'm not sure how that could be. There is no newly discovered evidence. There's nothing that's intertwined. So it really is a separate issue. But I do want to get to the merits because – well, I want to get to them simply because they're wrong on the merits. Whether this Court gets them or not, that's obviously the Court's decision, whether – as you did in Fogel, as this Court did in Fogel, we don't say to the world that you can play this game. You can sit and wait and hoard evidence, as I think the judge below said, and just spring it later, somehow claiming it's newly discovered. But on the merits, let's talk about the merits because that, too, is where the appellants are thin here, as thin as they were below. The Court looked at the risk disclosures and, you know, they really bear reading carefully. They are at Joint Appendix pages 529 through 532. And they are about as clear and specific about the – the warrants of risks are as clear and specific to the risks that do end up materializing as pretty much you're ever going to see. Chipotle said that their food was prepared from scratch. They warn us in their risk disclosures. Their food is prepared from scratch with the majority prepared in our restaurants. Instances of foodborne or localized illness could cause the temporary closure of some restaurants or result in negative publicity, thereby resulting in a decline in our sales. We, Chipotle, specifically, we may be at a higher risk for foodborne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen and our When was that statement in relation to the outbreaks? So that statement was in the 2014 10-K that was published in February of 2015. That is after there had already been the first two or three outbreaks, as appellants noted. And so here's what Chipotle said. They said on a small number of occasions, one or more Chipotle restaurants have been associated with customer illnesses. And on those occasions, our sales have sometimes been adversely impacted. So we're not even in a case where plaintiffs can claim they said may and it was had. This is a situation where Chipotle said this can happen. And by the way, it has happened on a couple of occasions. But you didn't say that they had no ability to trace some of the product. A big part? They didn't say in this disclosure that they had no ability to trace some of the farm-to-table produce and some other products that were in the food. Well. Isn't that correct? They didn't say that because that's not true. I don't think there's even an allegation a plaintiff say or they could fairly say that Chipotle had no ability to trace its products. The whole record shows that many of the ingredients are traced. What plaintiffs' appellants here say is that the ability to trace was not what some people at the CDC argued that the ability to trace was not as strong as it could be because of the practice of preparing food on site instead of exclusively at a commissary. That is very much in the weeds and not the kind of thing, that kind of minor operational thing that you would ever disclose. But what Chipotle did say, to continue with their disclosures, is that they had made a significant commitment to serving local or organic produce when seasonably available, and a small portion of our restaurants also serve produce purchased directly from farmers' markets. These produce initiatives may make it more difficult to keep quality constant and present additional risk of foodborne illnesses, given the greater number of suppliers involved in such a system and the difficulty of imposing our quality assurance program on all such suppliers. I mean... Right. And what they didn't disclose after that is that because they were buying from local farmers and from farmers' markets, they could not identify and remove contaminated ingredients that entered its supply chain. That's what they said is necessary after the material that you read. Well, Your Honor, I don't think the plaintiffs below any of their complaints did actually allege, because they couldn't. I'm reading from the PTAC 382 and 380. That's where they say that Chipotle lacked any ability during the class period to effectively or accurately trace ingredients from farm to restaurant. So that everything you say about buying organically from local farmers, very positive stuff, doesn't include that they lacked the ability to trace. What they say is that there's an issue tracing farm to table. Yes. They don't say there's no ability to trace ingredients. And that allegation, you know, with thousands of local suppliers and with using, including farmers' markets, and the notation that those practices are going to lead to an increased risk of foodborne illness, this additional... I think what the chain is is that because you can't trace it, they're not talking about foodborne illness. They say when foodborne illness appears, you can't trace the source. One of these incidents that are listed in the complaint had to do with cilantro. So, I mean, if you don't know where you got the cilantro or the tomatoes, how can you track it down and remove it from the food chain? But, Your Honor, what they actually alleged is that Chipotle had originally prepared ingredients in a commissary. They supposedly made a switch. That's what was supposedly different in late 2014. And as a result, combined with the inability supposedly to trace because of that switch, that's what led to all these problems. The fact is Judge Velia carefully went through each of these outbreaks, which they all sort of schmozzed together. There is one, one incident of the complained about switch. The only switch that they alleged happened is that they went from, because previously Chipotle had, going back years, disclosed that the majority of their ingredients were prepared locally. The majority had been already local. In late 2014, as plaintiffs allege, Chipotle changed its practice for tomatoes to start chopping tomatoes locally. That is the only specific instance that plaintiffs give anywhere, and it's in paragraph 296, I believe. And that tomato issue, there was exactly one incident that was supposedly linked or allegedly linked by one health department but not by another to that tomato issue. The other incidents were either unsolved or, in some cases, they were not foodborne illness. They were norovirus, which is from employees being sick. And, in fact, after the 10-Q gets filed, the major outbreak that comes, there's only, I think, two more, two or three more outbreaks that occur during the class period. But the major one that occurs, which gets a lot of publicity and attention, has nothing to do with food. It's about employees or customers being sick and allegedly transmitting norovirus to the rest of the ‑‑ Norovirus doesn't come from the vegetable. No, Your Honor. It is transmitted through contact, sneezing. It has nothing to do with the vegetable. And that's where ‑‑ and Judge Failio, she goes through these in some detail, and she parses through in the first couple go-rounds how these different incidents really don't match up to a cogent, compelling theory. There's no falsity here, but there certainly isn't the kind of cogent, strong inference of SIENTA that would be required for the court's ruling on SIENTA, if you were to get to the merits, to be overturned. And, by the way, the final statement I'd like to make, and I know I'm over time, is in ‑‑ I mean, over time, I guess, is the press release. You know, the press release, again, just like the risk disclosures, they really bear reading. Because the press release, and it's not in the joint appendix, I apologize. We have copies, if you'd like. But it's docket number 8510 in the record. And the press release headline is, Chipotle to reopen Northwest restaurants. That's the big headline. And underneath it, it says all test results are negative for E. coli, no ongoing threat. And the whole rest of the press release talks about reopening those 43 restaurants. Plaintiffs never do, and they certainly can't allege that it was not true that they were reopening. They did reopen. They can't allege that there was ever another incident there. There hasn't been, as far as I know. It certainly has never been reported. Those 43 restaurants did reopen. No more incidents at those 43 restaurants. Exactly what the press release says. So what did plaintiffs do below that they were faulted for? They pulled out snippets of lines out of the press release without even citing the press release to the court, let alone the title, and tried to create inferences that are not plausible. Judge Fallia faulted them for that. And certainly, if someone reads just the press release, you don't need anything else but to read the press release to see that she is correct in deciding that it is true. There's certainly not a sufficient pleading of material falsity to this press release, but there really certainly is not a sufficient allegation of scienter, where the out-of-context snippet claims of what the plaintiffs would say this press release supposedly means. There is an underlying possibility of a confusion, sorry, between a Securities Act claim and a Consumer Protection Act problem, where the standards and the problems are different. And it would be easy in a case like this to look at it from the consumer's point of view, rather than the people who are sick, their point of view, rather than the point of view of the. Indeed, Your Honor, I think one of the key cases the plaintiff cited did apply a different standard, an antitrust standard or another standard that's not the PSLRA standard for securities fraud. This is a simple, this is an unfortunate case. Okay. It's an unfortunate case of warned about risks that did materialize, leading to bad outcomes, which had no, by the way, no financial impact until the fourth quarter. And so, and plaintiffs don't, appellants don't argue otherwise. And by the way, once mid-quarter, the financial impacts start to be understood, Chipotle has a mid-quarter disclosure about the fourth quarter impacts. None of that's at issue here. But this is not a situation where a company was focused on, or even there's allegations that suggest a cogent or strong or compelling or whatever standard you want to say, effort to commit securities fraud. This is a case where it's a restaurant. They had some unfortunate incidents, which they specifically warned about and very specific to Chipotle because it prides itself so much on trying to use locally sourced food, and it sells that. By the way, they had another disclosure that said if we stop doing that, we may lose customers because of that. You know, they're sort of can't win either way. But they disclose all of this. The bad risk materialized. A couple of instances before the 10-K and then a few more before the Q. And then, and plaintiffs below have taken this to try to turn to securities fraud. They failed at two bites of the apple. They didn't appeal either of those decisions. And then they say we get an automatic chance for this court to pick this up de novo and reevaluate Judge Velia's two very thoughtful, carefully reasoned decisions. That, we believe, is not the standard of this court. If this court were to do that, we believe you should affirm Judge Velia. And thank you very much for your patience in letting me go over my time. Thank you. Mr. Willans, you've reserved two minutes for rebuttal. Yes, thank you. I assume you can expect I disagree with a lot of what my counsel said. I'll try and work backwards, and I'll try and go quickly. I have one issue. What is the one thing that you learned after the second amended complaint that allows us to think that we submitted, and it's in the record, the red line version of the difference between the SAC, the second amended complaint, and the proposed third amended complaint, so you could see the differences. There are specific pieces that you can point to. Oh, I can point to paragraph, I think it was 390, paragraph 393. We added an additional allegation from Chipotle's website that they had included that talked about how important traceability was to their food safety practices. That's just one example. I can't sit here and go through every one, but we certainly added new information that we received after. We did receive information for. I'm reading paragraph 393. Maybe you can tell me what you're talking about. This was an allegation. You have paragraph 393 in front of you. I have the red line copy, yes. All right. And it says, After the class period, Chipotle acknowledged that farm-to-table ingredient traceability is critical to the company's food safety program. That is a disclosure that they had added after the fact that we had added in. And the quote actually emphasizes the materiality of the traceability, which is exciting. What happened here is, you know, they had no function, whether they had the ability to trace some level from the supplier to their distribution center, they couldn't tell the CDC at any point in time information from the distribution center that went to the restaurants. They had no idea. They had no ability to prevent foodborne illness outbreaks from occurring, one, through the commissary switch, and two, through the traceability aspect. And each time one of these outbreaks happened, the CDC went to them and said, Please give us your traceability. We need to figure out the bigger health problem. And they said, Well, we don't have that information. We can't do that that well. Even, again, referencing the October 10Q, we have allegations that as late as September of 2015, Heidi Weterquist, who is the person in charge of these outbreaks, attended a food conference where she said, We're going to start this whole traceability problem so we can get Farm to Table going. So even right before that 10Q, they had no ability to trace it. So I think, Judge Poole, you hit the nail right on the head, where nothing in those risk disclosures talked about these. They're very generic. They said, On a small number of times, customers get sick in our stores. They said, If there's a food-borne outbreak that occurs, it may infect us adversely. But that was made in February 2015. Now we're talking about October 2015. By then, they have had 10 specific outbreaks. Sure, some of them were norovirus, but they didn't disclose any of them. Nothing. They just said, There are no material changes in our risk disclosures, even though they completely switched their operations, that food was done in the central commissary. There's no testing that goes on in their 1900 stores. So they had no ability to stop food on the front end, and they had no ability to take remedial steps on the back end, because they couldn't trace it back to the source. It's a whole cycle, and it's all interrelated. We have the commissary switch, 10 outbreaks occurred, they couldn't assist, and they had to disclose that. Yes, I agree it would make a nice consumer case, but we're here on... Yeah, I mean, as individual outbreaks occurred, that's why the CDC, you know, they couldn't solve these things. They couldn't say what's going on. But they certainly drew a link to Chipotle. I mean, if you go back, and I think some of these are new, but, you know, the CDC was in communication. Internally, they said, Well, look, this outbreak has a Chipotle signal or subcluster. What's going on at Chipotle that there's this sudden surge of outbreaks? Counsel, if we grant the relief you seek here, which is to allow, to vacate the judgment and allow the third, the PTAC, you're going to get a motion to dismiss as soon as it's filed. Probably, but I think, one, we can go back and, well, we'll get a motion to dismiss on loss causation. Is that what you're suggesting? You'll get a motion to dismiss on Sienta again and on... Well, and we're fine to deal with that. I mean, I think this Court can make the determination that our allegations are... Well, we're not going to determine anything on the merits if we... Well, you can determine whether we've sufficiently stated a claim. We would determine only that it's not futile. Okay, then I'm happy to go back and make these arguments with, and obviously we'd have to revise our complaint on the whole because we've obviously cut a lot out. But I'm happy to have that argument with the District Court. I mean, I think our arguments, I think our allegations are not futile. We've stated a claim for securities fraud based on the violations of the 10Q. And if I could just make one last statement about the press release. That press release, that statement, I mean, they say, oh, we're relying on snippets. I invite the Court to read the whole thing. They talk about what's happening nationwide. We took all this action nationwide. But the statement about what health officials concluded is arguably the most important part of that because they're pointing to the government and they're saying the government or the CDC here gave us authority to reopen these stores. The fact of the matter is the CDC or any health official had concluded nothing. They made no... In fact, they told Chipotle the opposite, that these outbreaks, that this is expanding beyond Washington. And then even then, on November 6th, they... We have allegation that White... We were told the FDA, we still can't trace these things. We don't... We can never determine the source of this. We have no ability to find out the food that came from the distribution center that was served in our restaurants. Everything they said was in the past tense. The false impression that was given by that press release was that this incident, whatever incident means, and we, if it's a plausible suggestion, the incident means the entirety of the outbreak, including the investigation, was over. And that's how the media responded. That's how customers responded because you saw the bounce back. And then 10 days later, the CDC came out like they said they would and they kept investigating. They said, we've got all these additional outbreaks that occurred across the country. So to say that health officials concluded there's no basis for that, they were aware of that at the time they made the statement, and the statement was actionable. Unless the Court has additional questions, I rely on my papers. I thank the Court for your patience, as my opposing counsel did, and thank you very much. Thank you both for a very good argument. We'll reserve decision.